# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
# AT JACKSON
## April 9, 2002 Session

## STATE OF TENNESSEE v. JIMMY LEE KING

### Appeal from the Circuit Court for Benton County
### No. CR895    Julian P. Guinn, Judge

---

### No. W2001-01690-CCA-R3-CD - Filed August 23, 2002

---

Jimmy Lee King stands convicted of the attempted first-degree murder of Billy Dwayne Pace.  King received his conviction at the conclusion of a jury trial in the Benton County Circuit Court, and he was sentenced to a 20-year incarcerative term.  Claiming that the evidence is insufficient to support the conviction, he has appealed.  Because we are unpersuaded, we affirm.

**Tenn. R. App. P. 3; Judgment of the Circuit Court Affirmed.**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which DAVID H. WELLES and DAVID G. HAYES, JJ., joined.

Stephen D. Jackson, Huntingdon, Tennessee, for the Appellant, Jimmy Lee King.

Paul G. Summers, Attorney General & Reporter; J. Ross Dyer, Assistant Attorney General; G. Robert Radford, District Attorney General; and Beth Boswell, Assistant District Attorney General, for the Appellee, State of Tennessee.

## OPINION

At trial, the evidence in the light most favorable to the state demonstrated that over Memorial Day Weekend 2000, the victim and Teresa Chappel became romantically involved.  Ms. Chappel had previously been involved with Fred Johnson, and she had been temporarily residing with Johnson while waiting for an apartment to be prepared for her occupancy.

On May 27, 2000, Ms. Chappel went to Mr. Johnson's residence for the purpose of claiming some clothing she had there.  She was accompanied by the victim, Jeremy Webb, and Jason White.  While Chappel and Johnson were in the back room and Chappel gathered her belongings, the two heard the sounds of things being moved and the refrigerator door being opened and closed.  Apparently, the victim took some videotapes of which he claimed ownership and some meat from the refrigerator.  Johnson and the victim got into an altercation.  There was disputed evidence

whether Johnson approached the victim with a baseball bat; however, it was not disputed that the two fought. The victim went outside and punctured two of Johnson's tires. After Ms. Chappel finished gathering her belongings, she, the victim, Webb, and White departed. They took the victim to his sister, Kim Boone's, residence.

From Boone's residence, the victim went to his grandmother's house, where he was living. There was conflicting evidence whether he drove himself or whether Kim Boone drove him. Boone, the victim, and Joe Holiday, who is Boone's live-in boyfriend, claimed that Boone drove the victim to his grandmother's house, although she wrecked her truck in a ditch along the way when several deer ran across the road. On the other hand, Jeremy Webb claimed to have seen the victim get into his truck and leave. Teresa Chappel claimed to have seen the victim get into his truck and start it. Whomever was driving, it is undisputed that the truck came to rest in a ditch along the side of Mount Carmel Road, a short distance from the victim's grandmother's house.

During the evening, Fred Johnson and the defendant, who had recently moved into Johnson's home, came to Boone's home looking for the victim.[1] Johnson and the defendant were mad. Joe Holiday offered to buy Johnson some new tires to avert any trouble over the earlier events. The defendant said, "Well, we ain't going to worry about it, we'll take care of it the Smyrna way."[2]

After the victim had eaten at his grandmother's house, he wanted a cigarette. Because he had left his cigarettes in the wrecked truck, he set out on foot to retrieve them. For protection, he carried an aluminum baseball bat.

After the victim reached the truck, the defendant pulled up in his white Riviera. Michelle King and Fred Johnson were with the defendant. Michelle King, the defendant's girlfriend, got out of the Riviera and began a "mean" and "hateful" diatribe against the victim. The victim saw the defendant put something on top of the car, which the victim recognized as a shotgun or rifle. He implored the defendant, "[N]o, Jim, don't do this," but the defendant fired, and the victim was hit in the chest. The victim fell to the ground, and he heard laughter. He was eventually able to get up and walk for some distance. Fortunately for the victim, a truck came by, and its occupants took him to the hospital.

Due to its location, the bullet which hit the victim was not removed. However, medical evidence received by stipulation included the opinion that the bullet was .22 caliber. A Benton County sheriff's deputy testified that the victim's wound was of a size consistent with a .22 caliber bullet. Multiple witnesses testified that the defendant owned a .22 caliber weapon, but the defendant denied that he had ever owned a firearm.

---

[1] The evidence relative to Johnson's and the defendant's presence at Boone's home is convoluted and incapable of complete reconciliation. However, the discrepancies do not pertain to essential facts for purposes of this appeal. There is some evidence that Johnson and the defendant came to Boone's home looking for the victim twice that evening.

[2] The pertinent events in this case transpired in and near the Smyrna community.

One of the individuals who rescued the victim from the roadside testified that the victim told him the person who shot him was named "William." On cross-examination, however, he conceded that the victim's speech was indistinct, and he had a difficult time understanding him. The witness said the victim might have thought that the witness was asking the victim his name,[3] rather than the name of the shooter.

A law enforcement officer who responded to the scene of the shooting testified that an envelope addressed to the defendant was recovered from the roadway at the scene.

The defendant presented an alibi defense, whereby he claimed that he was not present at the scene of the crime. He presented evidence of his whereabouts on the evening in question consisting primarily of his testimony and that of Fred Johnson that the defendant was at the Smyrna Club all evening other than brief trips to purchase cigarettes and to pick up Fred Johnson. The defendant hypothesized that the victim picked up the envelope addressed to the defendant along with the videotapes that the victim took from Fred Johnson's house.

To rebut the defendant's protestations of innocence, the state offered evidence that Fred Johnson admitted to Teresa Chappel on the evening of the crime that he, Michelle King, and the defendant went looking for the defendant and found him in a ditch, whereupon the defendant shot him. Later, Michelle King discussed the shooting with Ms. Chappel. Chapell claimed she probably had discussed the shooting with the defendant as well, although she professed to remember no details of any such conversation.

Both Michelle King and the defendant denied that they had any conversations with Chappel relative to the shooting of the victim.

Throughout the trial, both the state and the defense were successful in impeaching various witnesses. This was a classic case in which the credibility of witnesses was the deciding factor. The jury chose the state's version of facts as credible and returned a verdict of guilty of attempted first-degree murder.

Claiming that the jury's resolution of factual issues was erroneous, the defendant has appealed.

When an accused challenges the sufficiency of the convicting evidence, this court must review the record to determine if the evidence adduced at trial is sufficient "to support the finding by the trier of fact of guilt beyond a reasonable doubt." Tenn. R. App. P. 13(e). This rule is applicable to findings of guilt based upon direct evidence, circumstantial evidence, or a

---

[3]The victim was referred to by the names "Billy," "Bill" and "Dwayne" by the trial witnesses. The victim's medical records and the indictment use the name "Billy Dwayne Pace." There is no evidence that his given name is William.

combination of direct and circumstantial evidence. *State v. Dykes*, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990).

In determining the sufficiency of the convicting evidence, this court does not re-weigh or re-evaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this court substitute its inferences for those drawn by the trier of fact from circumstantial evidence. *Liakas v. State*, 199 Tenn. 298, 305, 286 S.W.2d 856, 859 (1956). To the contrary, this court is required to afford the state the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978).

Questions concerning the credibility of the witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact, not this court. *Id*. at 835. In *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973), our supreme court said: "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the state."

Because a verdict of guilt removes the presumption of innocence and replaces it with a presumption of guilt, the accused, as the appellant, has the burden in this court of illustrating why the evidence is insufficient to support the verdicts returned by the trier of fact. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). This court will not disturb a verdict of guilt due to the sufficiency of the evidence unless the facts contained in the record are insufficient, as a matter of law, for a rational trier of fact to find that the accused is guilty beyond a reasonable doubt. *Id*. at 914.

The defendant's appellate argument consists primarily of various attacks upon credibility of the state's witnesses. The defense highlights drug and alcohol usage of the state's witnesses and conflicts in the state's evidence. It also suggests inadequate law enforcement investigation of the scene and of the information that "William" shot the victim.

There can be no doubt that the evidence in this case was sharply conflicting and that the credibility of many of the witnesses was subject to question. However, as an appellate court, we are not able to reweigh the evidence to suit the appealing defendant when that evidence, viewed in the light most favorable to the state, points to the defendant's guilt beyond a reasonable doubt. The evidence in this case does just that. Fred Johnson, with whom the defendant lived, got into an altercation with the victim on the day of the crime. Johnson and the defendant searched for the victim, and the defendant expressed a desire to take care of the dispute "the Smyrna way." The defendant, accompanied by his girlfriend and Johnson, shot the victim and drove away, leaving the victim alongside the road in a remote area.

From the foregoing facts, a reasonable jury could infer that the defendant premeditatedly shot the victim with the intent to kill him. *See* Tenn. Code Ann. §§ 39-121-101(a)(2) (1997) (attempt); 39-13-202(a)(1) (Supp. 2001) (first-degree premeditated murder). Thus, we are foreclosed from second-guessing the jury's verdict.

Accordingly, the judgment of the trial court is affirmed.

_____
JAMES CURWOOD WITT, JR., JUDGE